UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

CALIFORNIANS FOR RENEWABLE
ENERGY, *et al.*,

    Plaintiffs,

    v.

UNITED STATES DEPARTMENT OF
ENERGY, *et al.*,

    Defendants.

Civil Action No. 11-2128 (JEB)

## MEMORANDUM OPINION

Plaintiff Californians for Renewable Energy (CARE) is a non-profit organization dedicated to the responsible development of renewable energy. It advocates for energy projects that are sensitive to the environment and surrounding communities and are viable without inappropriate subsidies. In 2009, as part of the American Recovery and Reinvestment Act, Congress authorized the Department of Energy for the first time to issue loan guarantees for energy projects that use commercially available technology, as opposed to requiring new or innovative technology. CARE and its President, Michael Boyd, have filed the instant suit challenging these guarantees on the ground that DOE failed to promulgate regulations governing the selection of applicants and the implementation of the program as required by Title XVII of the Energy Policy Act. As a consequence of this procedural defect, Plaintiffs contend they were deprived of the right to comment on such regulations and have suffered recreational, aesthetic, and financial harms because of the unlawfully issued guarantees.

Defendants DOE, Department of the Treasury, Federal Financing Bank, Steven Chu (in his official capacity as Secretary of DOE), and Timothy Geithner (in his official capacity as Secretary of the Treasury) have now moved to dismiss for lack of subject-matter jurisdiction, arguing that Plaintiffs do not have standing to bring this challenge. Because Plaintiffs have not demonstrated injury, causation, and redressability – the three elements required for Article III standing – the Court will grant Defendants' Motion and dismiss the case without prejudice.

## I. Background

Title XVII of the Energy Policy Act of 2005, Pub. L. No. 109-58, §§ 1701-05 (2005) (codified at 42 U.S.C. §§ 16511-14, 16516), authorizes the federal government to issue loan guarantees for certain energy projects. Specifically, it permits the Secretary of Energy, after consulting with the Secretary of the Treasury, to guarantee loans for energy projects that address air pollution or anthropogenic emissions of greenhouse gases and use "new or significantly improved technologies as compared to commercial technologies in service in the United States at the time the guarantee is issued." Id., § 1703 (codified at 42 U.S.C. § 16513). In other words, prior to 2009, Title XVII loan guarantees were not available unless the projects employed new or significantly improved technologies.

In 2009, Congress, responding to the economic crisis the country was facing, enacted a stimulus package known as the American Recovery and Reinvestment Act, Pub. L. No. 111-5 (2009), which, among other things, modified the Energy Policy Act. Concerned that the contraction in the credit market would bring energy-infrastructure investments to a halt, Congress temporarily expanded the scope of projects eligible for loan guarantees from the Department of Energy. Id., § 406 (codified at 42 U.S.C. §16516). In particular, it added § 1705 to the Energy Policy Act, permitting the Secretary of Energy to guarantee loans for "renewable

[energy] and transmission projects that are based on commercially available technology, a category of projects not included in the original statute." See S. Rep. No. 111-3 at 33 (2009); see also 42 U.S.C. §16516(a) (listing categories of projects). Six billion dollars was originally appropriated for that purpose, but Congress ultimately transferred $3.6 billion to other programs, leaving $2.4 billion for § 1705 loan guarantees. Compl., ¶¶ 12, 17. From the initiation of the program in 2009 to its expiration on September 30, 2011, DOE issued several solicitations, inviting applications for the loan guarantees. Compl., ¶¶ 14-16; 42 U.S.C. § 16515(e); see also Loan Guarantee Solicitations, U.S. Department of Energy Loan Programs Office, https://lpo.energy.gov/?page_id=58 (last visited May 15, 2012). Each solicitation focused on a different category of energy technology and set forth eligibility and selection criteria. Id. DOE, through the Federal Financing Bank (a government corporation), guaranteed 100% of the principal and interest of recipients' loans. According to the Complaint, at least 26 loan guarantees were provided under the program. See Compl., ¶¶ 23-54. Now that the program has expired, the Secretary retains authority under unchanged § 1703 to guarantee financing only for energy projects that use innovative technologies. See 42 U.S.C. § 16515(e).

Californians for Renewable Energy is a non-profit that "advocate[s] for environmentally- and community-sensitive energy projects that are commercially viable without inappropriate subsidies." Compl., ¶ 1. The organization is led by Michael E. Boyd, "a California ratepayer [and] a federal taxpayer" who alleges he "will suffer the environmental impacts of the solar energy projects in Southern California." Id., ¶ 2. On November 23, 2011, CARE and Boyd filed suit alleging that 26 loan guarantees issued under § 1705 are unlawful. Defendants have now moved to dismiss for lack of subject-matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1). The Court considers that Motion here.

## II.     Legal Standard

In evaluating a motion to dismiss under Rule 12(b)(1), the Court must "treat the complaint's factual allegations as true . . . and must grant plaintiff 'the benefit of all inferences that can be derived from the facts alleged.'" Sparrow v. United Air Lines, Inc., 216 F.3d 1111, 1113 (D.C. Cir. 2000) (quoting Schuler v. United States, 617 F.2d 605, 608 (D.C. Cir. 1979)) (internal citation omitted); see also Jerome Stevens Pharms., Inc. v. FDA, 402 F.3d 1249, 1253 (D.C. Cir. 2005). The Court need not accept as true, however, "a legal conclusion couched as a factual allegation," nor an inference unsupported by the facts set forth in the Complaint. Trudeau v. Fed. Trade Comm'n, 456 F.3d 178, 193 (D.C. Cir. 2006) (quoting Papasan v. Allain, 478 U.S. 265, 286 (1986)) (internal quotation marks omitted).

To survive a motion to dismiss under Rule 12(b)(1), Plaintiffs bear the burden of proving that the Court has subject-matter jurisdiction to hear their claims. See Lujan v. Defenders of Wildlife, 504 U.S. 555, 561 (1992); U.S. Ecology, Inc. v. U.S. Dep't of Interior, 231 F.3d 20, 24 (D.C. Cir. 2000). A court has an "affirmative obligation to ensure that it is acting within the scope of its jurisdictional authority." Grand Lodge of Fraternal Order of Police v. Ashcroft, 185 F. Supp. 2d 9, 13 (D.D.C. 2001). For this reason, "'the [p]laintiff's factual allegations in the complaint . . . will bear closer scrutiny in resolving a 12(b)(1) motion' than in resolving a 12(b)(6) motion for failure to state a claim." Id. at 13-14 (quoting 5A Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure § 1350 (2d ed. 1987) (alteration in original)).

Additionally, unlike with a motion to dismiss under Rule 12(b)(6), the Court "may consider materials outside the pleadings in deciding whether to grant a motion to dismiss for lack of jurisdiction." Jerome Stevens, 402 F.3d at 1253; see also Venetian Casino Resort, L.L.C. v. E.E.O.C., 409 F.3d 359, 366 (D.C. Cir. 2005) ("given the present posture of this case — a

dismissal under Rule 12(b)(1) on ripeness grounds — the court may consider materials outside the pleadings"); Herbert v. Nat'l Academy of Sciences, 974 F.2d 192, 197 (D.C. Cir. 1992).

**III.     Analysis**

Defendants seek to dismiss the Complaint on the ground that Plaintiffs lack standing, leaving the Court without subject-matter jurisdiction over their claims. Defendants argue, first, that Plaintiffs have failed to show injury, causation, and redressability – the three elements necessary to establish standing under Article III. See Mot. at 7-12. In the alternative, they contend that Plaintiffs lack "prudential standing" because the interests they seek to protect are outside the "zone of interests" safeguarded by § 1705 of the Energy Policy Act. Id. at 12-16.

Article III of the Constitution limits the power of the federal judiciary to the resolution of "Cases" and "Controversies." U.S. Const. art. III, § 2; see also Allen v. Wright, 468 U.S. 737, 750 (1984) (discussing case-or-controversy requirement). "This limitation is no mere formality: it 'defines with respect to the Judicial Branch the idea of separation of powers on which the Federal Government is founded.'" Dominguez v. UAL Corp., 666 F.3d 1359, 1361 (D.C. Cir. 2012) (quoting Allen, 468 U.S. at 750). Because "standing is an essential and unchanging part of the case-or-controversy requirement of Article III," Lujan, 504 U.S. at 560, finding that a plaintiff has standing is a necessary "predicate to any exercise of [the Court's] jurisdiction." Fla. Audubon Soc'y v. Bentsen, 94 F.3d 658, 663 (D.C. Cir. 1996).

The doctrine of standing "requires federal courts to satisfy themselves that 'the plaintiff has alleged such a personal stake in the outcome of the controversy as to warrant his invocation of federal-court jurisdiction.'" Summers v. Earth Island Institute, 555 U.S. 488, 493 (2009) (citing Warth v. Seldin, 422 U.S. 490, 498-99 (1975)) (emphasis in original). At its "irreducible constitutional minimum," the doctrine requires a plaintiff to prove three elements: (1) a concrete

and particularized injury-in-fact, (2) a causal relationship between the injury and defendants' challenged conduct, and (3) a likelihood that the injury suffered will be redressed by a favorable decision. See Lujan, 504 U.S. at 560-61. Organizations suing on their own behalf, like individuals, must satisfy these three requirements. See National Taxpayers Union, Inc. v. U.S., 68 F.3d 1428, 1433 (D.C. Cir. 1995) (citing Havens Realty Corp. v. Coleman, 455 U.S. 363, 378 (1982)).

In this case, however, CARE does not claim to have been injured as an organization. Instead, it maintains that its members have been harmed. When an organization is suing on behalf of its members, it must establish "representational" or "associational" standing. To do so, it needs to show that "its members would otherwise have standing to sue in their own right, the interests at stake are germane to the organization's purpose, and neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." Friends of the Earth, Inc. v. Laidlaw Environmental Services, Inc., 528 U.S. 167, 181 (2000) (citing Hunt v. Washington State Apple Advertising Comm'n, 432 U.S. 333, 343 (1977)); see also American Library Ass'n v. F.C.C., 401 F.3d 489, 492 (D.C. Cir. 2005). To satisfy the first prong, it is "not enough to aver that unidentified members have been injured." Chamber of Commerce v. EPA, 642 F.3d 192, 199 (D.C. Cir. 2011). Rather, the organization must name at least one member who has suffered the requisite harm. See Summers, 555 U.S. at 498-99.

Because Michael Boyd is the only member of CARE named in the Complaint (or the Opposition) and the only individual plaintiff, the Court must analyze whether he has standing to bring this suit. If he does not, then CARE has no associational standing either. As a preliminary matter, while Plaintiffs challenge the loan guarantees for 26 projects, Boyd claims injury from only three in his declaration: the Abengoa Mojave Solar project, the Genesis project, and the

Desert Sunlight project. See Compl., ¶¶ 23-54; Boyd Decl., ¶¶ 15, 18. Of those three, only Abengoa Mojave and Desert Sunlight are named in the Complaint. Compl., ¶¶ 44, 47. The Court's task, therefore, is to determine whether Boyd can establish standing in relation to these two projects.

    A. Injury-in-Fact

Defendants first argue that Plaintiffs have not alleged an injury sufficient to support Article III standing. See Mot. at 7-10. In response, Plaintiffs contend that Boyd has already suffered or will imminently suffer three kinds of injury: (1) deprivation of procedural rights, (2) environmental, recreational, and aesthetic harms, and (3) financial harm from increased utility rates. The Court will address each in turn.

With respect to the first, Plaintiffs allege that Boyd was "deprived of the public-participation opportunities and benefits that the Administrative Procedure Act ('APA') requires." Opp. at 10; see also id. at 11 (Boyd's injury "includes not being able to help DOE establish sound final regulations for vetting Section 1705 projects, through comments on proposed regulations as required by the APA"); Boyd Decl., ¶ 20 (voicing concern that DOE did not pass statutorily required regulations or allow opportunity for public input). When Congress passed Public Law 110-5 in 2007, appropriating funds for Title XVII loan guarantees, it prohibited DOE from awarding such guarantees "until final regulations are issued that include – (1) programmatic, technical, and financial factors the Secretary will use to select projects for loan guarantees; (2) policies and procedures for selecting and monitoring lenders and loan performance; and (3) any other policies, procedures, and information necessary to implement Title XVII of the Energy Policy Act." 42 U.S.C. § 16515(b). While DOE did issue such regulations with respect to projects eligible for guarantees under § 1703 – i.e., projects employing innovative technologies – see 72 Fed. Reg. 60116 (Oct. 23, 2007), 10 C.F.R. 609, it is

7

undisputed that it did not issue new regulations after § 1705 was added to Title XVII in 2009. See Opp. at 6.

Even assuming (without deciding) that Defendants failed to comply with a statutory requirement to issue regulations before guaranteeing loans under § 1705, a denial of the opportunity to comment on a proposed rule does not, on its own, constitute an injury for standing purposes. See Int'l Bhd. of Teamsters v. TSA, 429 F.3d 1130, 1135 (D.C. Cir. 2005) ("[T]he mere inability to comment effectively or fully, in and of itself, does not establish an actual injury.") (internal quotation omitted). As the Supreme Court has stated, a "deprivation of a procedural right without some concrete interest that is affected by the deprivation—a procedural right *in vacuo*—is insufficient to create Article III standing." Summers, 555 U.S. at 496; see also United Transp. Union v. ICC, 891 F.2d 908, 918 (D.C. Cir. 1989) (requiring "some connection between the alleged procedural injury and a substantive injury that would otherwise confer [Article III] standing").

Plaintiffs here have not demonstrated that Boyd suffered a concrete injury as a result of DOE's alleged failure to issue final regulations regarding § 1705, which thus deprived the public of an opportunity to comment. As Plaintiffs themselves acknowledge, the procedural injury they allegedly suffered was not specific to Boyd, but was indeed shared by "every member of the public." Opp. at 10. Such a generalized injury will not suffice. To demonstrate injury for standing purposes, a plaintiff must show that he or she was injured in a "personal and individual way." Lujan, 504 U.S. at 560 n.1; see also id. at 573-74 ("[A] plaintiff raising only a generally available grievance about government … does not state an Article III case or controversy."); Ctr. For Biological Diversity v. Dep't of Interior, 563 F.3d 466, 478 (D.C. Cir. 2009) (harm "shared by humanity at large" too generalized to support standing). Boyd's assertion that he "desired a

loan guarantee under Section 1705" does not give him a concrete interest, furthermore, as he never even alleges that he applied for such a guarantee. Boyd Decl., ¶ 17. Finally, the fact that CARE as an organization is concerned with the "responsible development of renewable energy" without "inappropriate subsidies," Compl., ¶ 1, is likewise of no moment, as associational standing still requires an individual member to have suffered an injury. Plaintiffs have thus failed to demonstrate that the absence of notice-and-comment rulemaking caused them procedural harm sufficient to meet the injury requirement for Article III standing.

Plaintiffs' second argument – namely that Boyd will suffer environmental, aesthetic, and recreational harms from the loan guarantees under § 1705 – fails for similar reasons. The allegations of environmental harm, like those of procedural injury, are too broad to constitute an injury-in-fact under Article III. Boyd asserts – based on the redaction of the estimated greenhouse gas reductions in a FIOA response regarding a single loan-guaranteed project – that the projects DOE supported contribute to greenhouse gas emissions while giving "false assurances" that such emissions will be reduced. Boyd Decl., ¶ 19. Not only does this statement appear to be purely speculative, but it is also too generalized to support standing. See Summers, 555 U.S. at 494 ("[G]eneralized harm to … the environment will not alone support standing."); see also Fla. Audubon, 94 F.3d at 670, Lujan, 504 U.S. at 565. This Circuit, when considering standing in a climate-change case, found that the effects were not individualized enough to constitute concrete, particularized injury. See Ctr. for Biological Diversity v. Dep't of Interior, 563 F.3d 466, 478 (D.C. Cir. 2009). The same rationale applies to the environmental injury alleged here.

Plaintiffs counter that in Center for Biological Diversity v. Abraham, 218 F. Supp. 2d 1143 (N.D. Cal. 2002), the court found that the injury requirement had been met where the

9

plaintiff alleged harm based on the emission of harmful pollutants from gasoline-run vehicles. Id. at 1155. Because that holding is from a district court in another jurisdiction, this Court is not bound by it. In any event, the Supreme Court subsequently rejected the relaxed standard for imminence employed in Abraham, see Summers, 555 U.S. at 494-96, and this Circuit has likewise repudiated the kind of "predictive assumptions" about environmental harms that that court employed. See Fla. Audubon, 94 F.3d at 670. As such, Abraham does not advance Plaintiff's arguments here.

With respect to his alleged aesthetic and recreational harm, Boyd declares that he has suffered (and will in the future suffer) such injury on account of the construction and operation of two projects in Southern California. See Boyd Decl., ¶ 18. It is well established that "aesthetic, conservational, and recreational" harms can serve as a basis for standing, but "the 'injury in fact' test requires more than an injury to a cognizable interest." Sierra Club v. Morton, 405 U.S. 727, 734-35 (1972); see also Summers, 555 U.S. at 494 ("While generalized harm to the forest or the environment will not alone support standing, if that harm in fact affects the recreational or even the mere esthetic interests of the plaintiff, that will suffice."). The party seeking review must show that he himself faces "'actual or imminent' injury." Id. at 496 (quoting Lujan, 504 U.S. at 564); see also Sierra Club, 405 U.S. at 735.

"[E]nvironmental plaintiffs adequately allege injury in fact when they aver that they use the affected area and are persons 'for whom the aesthetic and recreational values of the area will be lessened' by the challenged activity." Friends of the Earth, 528 U.S. at 183 (quoting Sierra Club, 405 U.S. at 735). Plaintiffs have not adequately pled such harm here. While the Complaint states that Boyd will "suffer the environmental impacts of the solar energy projects in Southern California," it says nothing about his recreational or aesthetic interests specifically.

10

Compl., ¶ 2. It merely alleges that "CARE has members who reside, recreate, or otherwise utilize the areas in or near a number of the sites for renewable-energy projects that have received loan guarantees from the United States of America." Id., ¶ 1. Since it is "not enough to aver that unidentified members have been injured," the Court cannot find aesthetic or recreational injury on this basis. Chamber of Commerce, 642 F.3d at 199.

The allegations in Boyd's declaration fare better, but they still do not clear the hurdle. Although Boyd does not live in Southern California, he has regularly visited the Genesis and Desert Sunlight project sites and was denied access on at least one occasion due to project construction. See Boyd Decl., ¶ 18. While he does state that his "aesthetic and recreational experience" at the sites "has been adversely impacted" by the projects' construction, he does not allege the harm with sufficient specificity to establish aesthetic or recreational injury. See Boyd Decl., ¶ 18. First, he fails to specify which site he was prevented from accessing. This is a critical omission because only one of the two identified projects is a subject of this litigation. Desert Sunlight is named in the Complaint, while the Genesis Project is not – perhaps because it is the subject of a separate lawsuit in the Central District of California. See Compl., ¶ 47; La Cuna de Aztlan Sacred Sites Prot. Circle Advisory Comm. v. Dep't of Interior, 2011 WL 5545473 (C.D. Cal. 2011). Thus, if Boyd was denied access to the Genesis Project site, but not Desert Sunlight, he would have no basis for alleging actual aesthetic or recreational injury in this suit.

Conversely, even if Boyd had been kept from entering the Desert Sunlight project site, he has not established an aesthetic or recreational injury because he has failed to allege what recreational or aesthetic interest he personally has in the land. In Friends of the Earth, a seminal standing case, the Supreme Court determined that an environmental organization's members

11

suffered aesthetic and recreational harm because they submitted affidavits stating that they wished to use the land for specific recreational and aesthetic purposes – such as fishing, camping, swimming, hiking, and picnicking – but refrained from doing so because of the defendant's mercury-discharge violations. See Friends of the Earth, 528 U.S. at 181-183; see also Summers, 555 U.S. at 496 (to establish recreational injury, plaintiff must show that defendant acted "in a way that harm[ed] his recreational interests"). Here, by contrast, it is unclear for what purpose Boyd "regularly visited" the Desert Sunlight site and therefore what kind of harm he would have suffered if denied access. Boyd Decl., ¶ 18. In light of this, Plaintiffs have failed to establish that Boyd suffered actual aesthetic or recreational injury.

They have likewise failed to establish that Boyd will imminently suffer harm to these interests. For harm to be imminent, it requires a "specific and concrete plan." Summers, 555 U.S. at 495. A "vague desire to return [to the affected land] is insufficient to satisfy the requirement of imminent injury: 'Such some day intentions—without any description of concrete plans, or indeed any specification of when the some day will be – do not support a finding of … injury.'" Id. at 496 (quoting Lujan, 504 U.S. at 564). The only suggestion that Boyd will return to the project site is his statement that his "future enjoyment will be impacted by the operation of the projects." Boyd Decl., ¶ 18. This lone statement hardly qualifies as a "specific" or "concrete" plan and, as such, cannot satisfy the imminent-injury requirement for standing.

The final injury alleged by Plaintiffs is that Boyd will be harmed by increases in utility rates as a result of the federal government's loan guarantees under § 1705. Boyd is concerned that the state of California is allowing the projects that received loan guarantees from DOE to charge higher utility rates. Id., ¶ 15. He specifically contends that, as a Pacific Gas and Electric customer, he is going to be charged higher utility rates on account of the Abengoa Mojave

project and the Genesis Solar Energy project. Id. The Court need not decide whether this allegation satisfies the injury prong of Article III standing because, as it will discuss below, Plaintiffs have not met the causation requirement with respect to the financial harm alleged.

> B. Causation and Redressability

Assuming that increased utility rates would satisfy the injury requirement for standing, Plaintiffs would also have to show that the increase was caused by Defendant's challenged conduct. See Lujan, 504 U.S. at 560. Here, the violation Plaintiffs allege is Defendants' failure to issue final regulations regarding § 1705 loan guarantees through notice-and-comment procedures. See Compl., ¶¶ 64-65. In other words, Plaintiffs must demonstrate that Defendants' alleged procedural violation is responsible for Boyd's escalating utility rates. See Fla. Audubon, 94 F.3d at 664-65; Summers, 555 U.S. at 496 (causation requires showing that "some concrete interest [of Plaintiffs] is affected by the [procedural] deprivation"); United Transp. Union, 891 F.2d at 918 (requiring "some connection between the alleged procedural injury and a substantive injury that would otherwise confer standing"). This they cannot do.

The connection between the alleged procedural violation and the rate increases is simply too tenuous to support causation. First, there is no evidence that DOE would have used different selection criteria or awarded loan guarantees to different projects if it had passed regulations through notice-and-comment procedures. Second, even if there were, utility rates are not set by Defendants but by a third party – in this case, the California Public Utility Commission. See Cal. Pub. Util. Code §§ 451, 454 (West 2012); Boyd Decl., ¶ 15. Since rates are affected by a variety of factors, not the least of which is market forces entirely outside DOE's control, the impact of loan guarantees on utility rates is speculative at best. See Starbuck v. San Francisco, 556 F.2d 450, 459 (9th Cir. 1977); see also Common Cause v. Dep't of Energy, 702 F.2d 245, 251 (D.C. Cir. 1983) (causation becomes nebulous and difficult to prove in a market context). This Circuit

has "routinely refused to permit … predictive assumptions" about third-party behavior to substitute for genuine causal connection.  Florida Audubon, 94 F.3d at 670; see also Allen, 468 U.S. at 758-59, Simon v. E. Ky. Welfare Rights Org., 426 U.S. 26, 41-42 (1976), DaimlerChrysler Corp. v. Cuno, 547 U.S. 332, 344 (2006).

For the same reasons Plaintiffs have failed to establish causation, their claims are unlikely to be redressable by this Court.  The Supreme Court has held that causation and redressability are, in essence, "'two facets' of a single requirement."  Newdow v. Roberts, 603 F.3d 1002, 1012 (D.C. Cir. 2010) (citing Allen, 468 U.S. at 753 n.19).  Just as causation cannot be established when the alleged injury results from the independent action of a third party, neither can the Court redress the injury under these circumstances.  To the extent that redress is appropriate for the increased rates, it lies with the state public utility commission, not with Defendants.

Because the alleged procedural, recreational, and aesthetic harms do not constitute actual or imminent injury, and because the causation and redressability elements have not been met with respect to the financial harms, the Court finds that Plaintiffs have failed to establish that they have standing under Article III to bring this suit.  This Court will, accordingly, dismiss the case for lack of subject-matter jurisdiction without reaching prudential standing.

**IV.    Conclusion**

For the foregoing reasons, the Court will issue a contemporaneous Order dismissing the case without prejudice.

/s/ *James E. Boasberg*
JAMES E. BOASBERG
United States District Judge

Date:  May 17, 2012